Michael R. Lozeau (State Bar No. 142893)
E-mail: michael@lozeaudrury.com
Rebecca L. Davis (State Bar No. 271662)
E-mail: rebecca@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Attorneys for Plaintiff
THE CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE CALIFORNIA SPORTSFISHING PROTECTION ALLIANCE, a California nonprofit corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Tri C Manufacturing, Inc., a California corporation,<br><br>                    Defendant. | Case No.  _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

THE CALIFORNIA SPORTSFISHING PROTECTION ALLIANCE ("CSPA"), a California nonprofit corporation, by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provisions

of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.    On October 9, 2019, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Central Valley Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.    More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   INTRODUCTION

5.      This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility located at 520 Harbor Boulevard, West Sacramento, California ("Facility"). These discharges are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are collectively referred to hereinafter as the "Permit" or "General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

## III.   PARTIES

6.      Plaintiff CSPA is a nonprofit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California. CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including the Sacramento-San Joaquin Delta and the San Joaquin River. CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and the natural resources of all waters of California. To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

7.      CSPA has one or more members residing or recreating near the Facility, the Sacramento River, and the Sacramento-San Joaquin Delta. They enjoy using these waters for recreation and other activities. Members of CSPA use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause pollutants to be discharged. Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird

watch, view wildlife, and engage in scientific study including monitoring activities, among other things. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

8.    CSPA brings this action on behalf of its members. CSPA's interest in reducing Defendant's discharges of pollutants into the Sacramento River and the Sacramento-San Joaquin Delta and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CSPA.

9.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

10.    Defendant Tri C Manufacturing, Inc. ("Tri-C" or "Defendant") is a California corporation that owns and/or operates the Facility.

## IV.    STATUTORY BACKGROUND

### Clean Water Act

11.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

12.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33

U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

13.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

14.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

15.    The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015. The 2015 Permit went into effect on July 1, 2015. The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

16.    In order to discharge storm water lawfully in California, industrial

facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

17.    The General Permit contains several prohibitions. Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the General Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the General Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

18.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet. Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI"). Dischargers have been required to file NOIs since March 30, 1992.

19.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities

and measures that comply with the BAT and BCT standards. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. *See* 1997 Permit, § A(2); 2015 Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates. To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. 1997 Permit, §§ A(9), (10); 2015 Permit, § X(B). Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit. 2015 Permit, Fact Sheet § I(1).

20.     Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of industrial materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges, including structural BMPs where non-structural BMPs are not effective. Sections X(D)-X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations. *See* 2015 Permit, § X(H). The 2015 Permit further requires a more comprehensive

assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented. *See* 2015 Permit, §§ X(G)(2), (4), (5). Section X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

21.     The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *See* 2015 Permit, § X(H)(1). Failure to implement all of these minimum BMPs is a violation of the 2015 Permit. *See* 2015 Permit, Fact Sheet § I(2)(o).

22.     The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *See* 2015 Permit, § X(H)(2). Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit. *Id*. The 2015 Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table. *See* 2015 Permit § X(H)(4), (5).

23.     A facility must "ensure that the SWPPP identifies and justifies each minimum BMP or applicable advanced BMP not being implemented at the facility because they do not reflect best industry practice considering technological

1  availability and economic practicability and achievability." 2015 Permit, §

2  X(H)(4)(b). A facility's SWPPP must also identify where the minimum BMPs in

3  different areas of the facility will not adequately reduce the pollutants in the facility's

4  storm water dischargers and identify advanced BMPs for those areas. 2015 Permit §

5  X(G)(2). A Facility's BMPs must, at all times, be robust enough to meet the

6  requirement of the General Permit and of 33 U.S.C. section 1342(p)(3)(A) that all

7  discharges associated with industrial activities be subjected to BAT and BCT. 2015

8  Permit §§ V(A), I(A)(1), I(D)(31)-(32).

9      24.    The General Permit requires facility operators to develop and implement

10  an adequate Monitoring Implementation Plan ("MIP") (previously known as the

11  Monitoring and Reporting Program) for visual observations and for the sampling and

12  analysis of storm water discharges. *See* 2015 Permit, §§ X(I), XI. The primary

13  objective of such monitoring is to both observe and to detect and measure the

14  concentrations of pollutants in a facility's discharge to ensure compliance with the

15  General Permit's discharge prohibitions, effluent limitations, and receiving water

16  limitations. As part of their monitoring program, dischargers must identify all storm

17  water discharge locations that produce a significant storm water discharge, evaluate

18  the effectiveness of best management practices ("BMPs") in reducing pollutant

19  loading, and evaluate whether pollution control measures set out in the SWPPP are

20  adequate and properly implemented. Adequate monitoring and reporting ensures that

21  BMPs are effectively reducing and/or eliminating pollutants at a facility, and are

22  evaluated and revised whenever appropriate to ensure compliance with the General

23  Permit.

24      25.    Facilities are required to make monthly visual observations of storm

25  water discharges. The visual observations must represent the quality and quantity of

26  the facility's storm water discharges from the storm event. 1997 Permit, § B(7); 2015

27

28

COMPLAINT                                    9

Permit, § XI(A).

26.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30). Storm water discharges trigger the sampling requirement under the General Permit when they occur during facility operating hours and are preceded by 48-hours without storm water discharge. 2015 Permit, § XI(B). A sample must be collected from each discharge point at the facility within four hours of the start of the discharge or the start of facility operations if the discharge occurs within the previous 12-hour period. 2015 Permit, § XI(B)(5).

27.     Under the 2015 Permit, facilities must analyze storm water samples for total suspended solids ("TSS"), Oil & Grease, pH, "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment," and additional parameters applicable based on a facility's Standard Industrial Classification ("SIC") code. General Permit, § XI(B)(6).

28.     The 1997 Permit, in relevant part, requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE Report"). 1997 Permit, § B(14). As part of the ACSCE Report, the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed. The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge. The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and

sampling and analysis results. *See* 2015 Permit, § XV. Per Section XV(F) of the General Permit, a facility's Annual Evaluation must include "[a] review and effectiveness assessment of all BMPs for each area of industrial activity and associated potential pollutant sources to determine if the BMPs are properly designed, implemented, and are effective in reducing and preventing pollutants in industrial storm water discharges and authorized NSWDs." After conducting the Annual Evaluation, "[t]he Discharger shall revise the SWPPP, as appropriate, and implement the revisions within 90 days of the Annual Evaluation." *Id*. The General Permit then requires that a Discharger submit an Annual Report which includes the date of the Annual Evaluation as well as "[a]n identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year." 2015 Permit § XVI.

29.     Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." 1997 Permit, § B(5)(c)(ii). Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

30.     Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board. This requirement is continued with the 2015 Permit.  Fact Sheet, Paragraph O.

31.     The General Permit does not provide for any mixing zones by dischargers. The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

32.     The General Permit requires that a Discharger compare the results of its storm water discharge samples to the adopted annual Numeric Action Levels

("NALs") and instantaneous maximum NALs. 2015 Permit § XII(A). If sampling results for a given parameter indicate an NAL exceedance for that same parameter, the Discharger attains "Level 1 status," which commences on July 1 following the reporting year during which the exceedance occurred. 2015 Permit, § XII(C).

33.     By October 1 following commencement of Level 1 status, the Discharger must complete a Level 1 Exceedance Response Action ("ERA") Evaluation. 2015 Permit, § XII(C)(1). As part of the Level 1 ERA Evaluation, the Discharger must "[i]dentify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances." *Id.* No later than January 1 following commencement of Level 1 status, the Discharger must submit via SMARTS a Level 1 ERA Report. 2015 Permit § XII(C)(2). The Level 1 ERA report must be prepared by a Qualified Industrial Stormwater Practitioner ("QISP") and must contain "[a] summary of the Level 1 ERA Evaluation" and "[a] detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL." *Id.* A Discharger can move back to Baseline status from Level 1 status only when: (1) a Level 1 ERA report has been completed; (2) all identified additional BMPs have been implemented; and (3) results from four consecutive QSEs sampled after BMP implementation indicate no additional NAL exceedances for that parameter." *Id.*

**Basin Plan**

34.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries and the Sacramento-San Joaquin River Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – The Sacramento River Basin and The San Joaquin River Basin," generally referred to as the Basin Plan and the "Water Quality Control Plan

for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

35.     The beneficial uses of these waters include, among others, municipal and domestic supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water. These uses include, but are not limited to, picnicking, sunbathing, hiking, camping, boating, . . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

36.     Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

37.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

38.     The Basin Plan provides that "[w]ater shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses."

39.     The Basin Plan provides that "[w]ater shall be free of discoloration that causes nuisance or adversely affects beneficial uses."

40.     The Basin Plan provides that "[w]aters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses."

41.     The Basin Plan requires that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

42.     Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of 0.3 mg/L, and for zinc of 0.1 mg/L.

43.     The Basin Plan provides that "[a]t a minimum, water designated for use

as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs) specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals) and 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, and Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits) and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449." *Id.* at 3-16. Table 64449-A provides Secondary MCL ("SMCL") for iron of 0.3 mg/L. Table 64431-A provides a Primary MCL for aluminum of 1.0 mg/L and Table 64449-A provides a SMCL for aluminum of 0.2 mg/L.

44.     The General Permit establishes annual NALs and instantaneous maximum NALs. The following annual NALs have been established under the General Permit for pollutants discharged by the Facility: pH – 6.0-9.0 standard units ("s.u."); TSS – 100 mg/L; aluminum – 0.75 mg/L; N+N – 0.68 mg/L; zinc — 0.26 mg/L; and iron – 1.0 mg/L. The 2015 Permit also establishes an instantaneous maximum NAL for TSS of 400 mg/L.

45.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.

46.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. 2015 Permit, § XII(C). If a discharger exceeds an applicable NAL during Level 1 Status, it is then

1   elevated to "Level 2 Status." 2015 Permit, § XII(D). For Level 2 Status, a discharger

2   is required to submit an Exceedance Response Action ("ERA") Action Plan and an

3   ERA Technical Report requiring a demonstration of either additional BMPs to prevent

4   exceedances, a determination that the exceedance is solely due to non-industrial

5   pollutant sources, or a determination that the exceedance is solely due to the presence

6   of the pollutant in the natural background. 2015 Permit, § XII(D).

7        47.    EPA has established Parameter Benchmark Values as guidelines for

8   determining whether a facility discharging industrial storm water has implemented the

9   requisite BAT and BCT. These benchmarks represent pollutant concentrations at

10  which a storm water discharge could potentially impair, or contribute to impairing,

11  water quality, or affect human health from ingestion of water or fish. The following

12  EPA benchmarks have been established for pollution parameters relevant to the

13  Facility: TSS – 100 mg/L; aluminum – 0.75 mg/L; Nitrate & Nitrite as Nitrogen

14  ("N+N") – 0.68 mg/L; zinc – 0.08 – 0.2 mg/L; and iron – 1.0 mg/L.

15       48.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen

16  enforcement actions against any "person," including individuals, corporations, or

17  partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1)

18  and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33

19  U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil

20  penalties of up to $54,833 for violations occurring after November 2, 2015; and up to

21  $37,500 per day per violation occurring since October 28, 2011, up to and including

22  November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§

23  1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

24

25  **V.    STATEMENT OF FACTS**

26       49.    Defendant owns and/or operates the Facility that recycles used tires and

27  manufactures equipment to shred and sort tires, among other activities, in West

28

1    Sacramento, California.

2    50.    The Facility falls within Standard Industrial Classification ("SIC") Codes

3    5093 ("scrap and waste materials") and 3559 ("special industrial machinery, NEC").

4    51.    On October 23, 2017, Defendant filed a Notice of Intent enrolling the

5    Facility in the General Permit. Plaintiff is informed and believes and thereupon

6    alleges that Defendant had not filed a Notice of Intent for the Facility prior to October

7    23, 2017. Plaintiff is informed and believes and thereupon alleges that Defendant has

8    operated the Facility since at least January 6, 2015.

9    52.    The Facility covers approximately 3.4 acres. Approximately 85 percent

10   of the Facility consists of impervious surface area.

11   53.    Based on CSPA's investigation, including a review of the Facility's

12   Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"),

13   SWPPP, aerial photography, and CSPA's information and belief, storm water is

14   collected and discharged from the Facility via at least six storm water discharge

15   locations. Storm water discharged from the Facility flows into a municipal storm

16   drain, which discharges into the Sacramento River, which flows into the Sacramento-

17   San Joaquin Delta and Suisun Bay (collectively, "Facility Receiving Waters").

18   54.    Information available to Plaintiff indicates that the Facility Receiving

19   Waters are waters of the United States.

20   55.    Plaintiff is informed and believes, and thereupon alleges that the storm

21   water flows over the surface of the Facility where industrial activities occur including

22   activities associated with tire recycling and the manufacture of machines that shred

23   and sort tires.  This includes operation and maintenance, including receiving,

24   shredding, grinding, milling, sorting, and storing of tires and rubber; and sorting and

25   storing of scrap steel and aluminum from tires, among other activities.

26   56.    Plaintiff is informed and believes, and thereupon alleges, that storm

27

28

COMPLAINT                              16

water flowing over these areas collects metals and other pollutants as it flows toward the storm water discharge locations.

57.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

58.     On information and belief, Plaintiff alleges that there are insufficient structural storm water control measures installed at the Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to the waters of the United States. The Facility lacks sufficient structural control measures such as berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants. The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

59.     Since at least November 4, 2017, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility. The sample results are reported in the Facility's Annual Reports submitted to the Regional Board or in reports submitted to the State Board via the Stormwater Multiple Application and Report Tracking System ("SMARTS"). Defendant certified each of those reports pursuant to the General Permit.

60.     Plaintiff is informed and believes, and thereupon alleges, that Defendant did not take any storm water samples at the Facility prior to November 4, 2017.

61.     In Annual Reports and storm water sampling results submitted to the Regional Board and State Board, the Facility has consistently reported high pollutant levels from its storm water sampling results.

62.     The Facility has reported numerous discharges in excess of numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation V(A) of the 2015 Permit.

63.     The levels of aluminum in storm water detected by the Facility have exceeded the MCL for aluminum of 1.0 mg/L and the SMCL for aluminum of 0.2 mg/L. For example, on March 1, 2018, the level of aluminum measured from one of the Facility's storm water drains was 35 mg/L. That level of aluminum is 35 times the MCL for aluminum and 175 times the SMCL for aluminum. Specific dates, levels, and location on which Defendant has measured such exceedances of the WQO and SMCL for aluminum are contained in the Notice Letter attached as Exhibit A.

64.     The level of aluminum in storm water detected by the Facility has exceeded the annual NAL and benchmark value for aluminum of 0.75 mg/L established by the State Board and EPA, respectively. For the 2017-2018 reporting year, the Facility analyzed 15 samples of storm water for aluminum. The average concentration of aluminum in those 15 samples was 7.1 mg/L. That level of aluminum is more than seven times the annual NAL and benchmark value for aluminum. For the 2018-2019 reporting year, the Facility analyzed 20 samples of storm water for aluminum. The average concentration of aluminum in those 20 samples was 1.65 mg/L. That level of aluminum is more than two times the annual NAL and benchmark value for aluminum. Specific dates, levels, and location on which Defendant has measured such exceedances of aluminum are contained in the Notice Letter attached as Exhibit A.

65.     The levels of iron in storm water detected by the Facility have exceeded the WQO established by the Basin Plan of 0.3 mg/L for iron and SMCL for iron of 0.3

mg/L. For example, on January 8, 2018, the level of iron measured from one of the Facility's storm water drains was 52 mg/L. That level of iron is over 173 times the WQO and SMCL for iron. Specific dates, levels, and location on which Defendant has measured such exceedances of the WQO and SMCL for iron are contained in the Notice Letter attached as Exhibit A.

66.     The levels of iron in storm water detected by the Facility have exceeded the annual NAL and benchmark value for iron of 1 mg/L established by the State Board and EPA, respectively. For the 2017-2018 reporting year, the Facility analyzed 15 samples of storm water for iron. The average concentration of iron in those 15 samples was 20.92 mg/L. That level of iron is over twenty times the annual NAL and benchmark value for iron. For the 2018-2019 reporting year, the Facility analyzed 20 samples of storm water for iron. The average concentration of iron in those 20 samples was 3.95 mg/L. That level of iron is nearly four times the annual NAL and benchmark value for iron. Specific dates, levels, and location on which Defendant has measured such exceedances of iron are contained in the Notice Letter attached as Exhibit A.

67.     The levels of zinc in storm water detected by the Facility have exceeded the WQO established by the Basin Plan of 0.1 mg/L for zinc. For example, on March 1, 2018, the level of zinc measured from one of the Facility's storm water drains was 6.3 mg/L. That level of zinc is over 60 times the WQO for zinc. Specific dates, levels, and location on which Defendant has measured such exceedances of the WQO for zinc are contained in the Notice Letter attached as Exhibit A.

68.     The levels of zinc in storm water detected by the Facility have exceeded the annual NAL and benchmark value for zinc of 0.26 mg/L established by the State Board and EPA, respectively. For the 2017-2018 reporting year, the Facility analyzed 15 samples of storm water for zinc. The average concentration of zinc in those 15

samples was 1.65 mg/L.  That level of zinc is over six times the annual NAL and benchmark value for iron. For the 2018-2019 reporting year, the Facility analyzed 20 samples of storm water for zinc. The average concentration of zinc in those 20 samples was 0.33 mg/L. That level of zinc exceeds the annual NAL and benchmark value for zinc. Specific dates, levels, and location on which Defendant has measured such exceedances of zinc are contained in the Notice Letter attached as Exhibit A.

69.     The levels of TSS in storm water detected by the Facility have repeatedly exceeded the instantaneous maximum NAL of 400 mg/L established by the State Board. During the 2017-2018 reporting year, the Facility reported four storm events where the TSS concentrations in the Facility's storm water discharges exceeded 400 mg/L. On March 13, 2018, the level of TSS measured from the Facility's storm water discharge point DP#1 was 540 mg/L. On March 1, 2018 the level of TSS measured from the Facility's storm water discharge point DP#1 was 1000 mg/L. On January 8, 2018, the level of TSS measured from the Facility's storm water discharge point DP#1 was 910 mg/L. On November 16, 2017, the level of TSS measured from the Facility's storm water discharge point DP#1 was 470 mg/L.

70.     The levels of TSS in storm water detected by the Facility has exceeded the annual NAL and benchmark value of 100 mg/L established by the State Board and EPA, respectfully. For the 2017-2018 reporting year, the Facility analyzed 15 samples of storm water for TSS. The average concentration of TSS in those samples was 266.6 mg/L. That level of TSS is more than double the annual NAL and benchmark value for TSS. Specific dates, levels, and location on which Defendant has measured such exceedances of TSS are contained in the Notice Letter attached as Exhibit A.

71.     On information and belief, CSPA alleges that Tri-C developed an MIP that required the Facility to collect and analyze storm water samples consistent with the General Permit requirements but the Facility failed to comply with their MIP and

the General Permit during the 2017-2018 reporting years by failing to collect and analyze the requisite number of storm water samples.

72.     On information and belief, CSPA alleges that during the first half of the 2017-2018 reporting year, Tri-C failed to collect and analyze storm water samples from one of the two required storm water sampling events at discharge locations DP#3 and DP#5.

73.     On information and belief, CSPA alleges that during both the first and second half of the 2017-2018 reporting year, Tri-C failed to collect and analyze storm water samples at the Facility from the two required storm water sampling events at discharge location DP#4.

74.     On information and belief, CSPA alleges that storm water discharges occurred from the Facility on the following dates: November 4 and 16, 2017; January 8, 2018; March 1, 2018; and March 13, 2018.

75.     Plaintiff is informed and believes, and thereupon alleges, that storm water discharges have occurred from the Facility on the dates listed in Attachment A of Exhibit A.

76.     On information and belief, Plaintiff alleges that since at least January 6, 2015, Defendant has failed to implement BAT and BCT at the Facility for its discharges of aluminum, iron, zinc, and TSS. Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992. As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

77.     On information and belief, Plaintiff alleges that since at least January 6, 2015, Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for

the Facility does not set forth site-specific best management practices for the facility

that are consistent with BAT or BCT for the Facility. Plaintiff is informed and

believes, and thereupon alleges, that the SWPPP prepared for the Facility does not

comply with the requirements of Section X(H) of the 2015 Permit. The SWPPP also

fails to identify and implement advanced BMPs that are not being implemented at the

Facility because they do not reflect best industry practice considering BAT/BCT.

Plaintiff is informed and believes, and thereupon alleges, that the Facility's SWPPP has

not been evaluated to ensure its effectiveness and revised where necessary to further

reduce pollutant discharges. Plaintiff is informed and believes, and thereupon alleges,

that the Facility has failed to implement advanced BMPs as necessary to achieve

compliance with either technology or water quality standards. Plaintiff is informed and

believes, and thereupon alleges, that the SWPPP does not include each of the

mandatory elements required by the General Permit.

78.     Information available to Plaintiff indicates that as a result of these

practices, storm water containing excessive pollutants is being discharged from the

Facility during rain events to the municipal storm water system, which empties into

the Sacramento River, which flows into the Sacramento-San Joaquin Delta and Suisun

Bay.

79.     Plaintiff is informed and believes, and thereupon alleges, that Defendant

has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs

consistent with the General Permit.

80.     Information available to Plaintiff indicates that Defendant has not

fulfilled the requirements set forth in the General Permit for discharges from the

Facility due to the continued discharge of contaminated storm water. Plaintiff is

informed and believes, and thereupon alleges, that all of the violations alleged in this

Complaint are ongoing and continuous.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

81.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

82.    The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement BAT and BCT at the Facility for their discharges of aluminum, iron, zinc, and TSS in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

83.    Each day since January 6, 2015, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

84.    Defendant has been in violation of the BAT/BCT requirements every day since January 6, 2015. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

### SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

85.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

86.    Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition

III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

87.     Plaintiff is informed and believes, and thereupon alleges, that since at least January 6, 2015, Defendant has been discharging polluted storm water from the Facility in excess of the applicable water quality standards for aluminum, iron, and zinc in violation of Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit.

88.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with aluminum, iron, and zinc and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water from the Facility flows untreated into the municipal storm water system, which empties into the Sacramento River, which flows the Sacramento-San Joaquin Delta and Suisun Bay.

89.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

90.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

91.     Every day since at least January 6, 2015 that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

**THIRD CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

92.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

93.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

94.     Section X of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP.

95.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement adequate SWPPP for the Facility, is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

96.     Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility, is further evidenced by, *inter alia*, Defendant's failure to identify where the minimum BMPs in different areas of the facility will not adequately reduce the pollutants in the facility's storm water dischargers and to identify advanced BMPs for those areas as required by Section X(G)(2) of the General

Permit.

97.    Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

98.    Each day since January 6, 2015, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

99.    Defendant has been in violation of the Permit's SWPPP requirements every day since January 6, 2015. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

### FOURTH CAUSE OF ACTION
**Failure to Comply with the General Permit's Sampling Requirements and the Facility's Monitoring Plan**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

100.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

101.    Section XI(B)(2) of the General Permit requires dischargers of storm water associated with industrial activity to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of the reporting year.

102.    Plaintiff is informed and believes, and thereupon alleges that Defendant has failed to comply with these sampling requirements.

103.    Section X(I)  of the General Permit also requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

104.   Plaintiff is informed and believes and thereupon alleges that Defendant has failed to implement the sampling requirements included in the Facility's MIP for the Facility.

105.   Defendant's ongoing failure to comply with the General Permit's sampling requirements and the Facility's MIP is evidenced by, *inter alia*, its failure to collect and analyze any samples from discharge location DP#4 during 2017-2018, and its failure to collect two samples during the first half of the 2017-2018 reporting year at discharge locations DP#3 and DP#5.

106.   Each day since at least January 6, 2015, that Defendant has failed to sample the requisite number of QSEs in violation of the General Permit and/or the Facility's MIP is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm

water from contributing to violations of any water quality standards;

      f.     Order Defendant to comply with the Permit's sampling requirements including ordering supplemental monitoring to compensate for past monitoring violations;

      g.     Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

      h.     Order Defendant to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

      i.     Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

      j.     Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since October 13, 2014, up to and including November 2, 2015, and up to $54,833 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

      k.     Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

      l.     Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

      m.     Award any such other and further relief as this Court may deem appropriate.

//

1

2 Dated: January 6, 2020                    Respectfully submitted,

3

4                                 By:    */s/ Rebecca L. Davis*
                                         Rebecca L. Davis
5                                        LOZEAU DRURY LLP
6                                        Attorneys for The California Sportfishing
                                         Protection Alliance
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                    29